BOSWELL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Cr. No.: 19-cr-20083-SHL** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | **18 U.S.C. § 1347** |
| | ) | **21 U.S.C. § 846** |
| **JAMES LITTON,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

# FIRST SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

At all times material to this indictment:

## DEFENDANT

1.     Defendant **JAMES LITTON ("LITTON")** was a Nurse Practitioner, licensed by the State of Tennessee. **LITTON** maintained a Drug Enforcement Administration Registration ("DEA") Numbers in both Tennessee and Mississippi. **LITTON** issued prescriptions for controlled substances, including the Schedule II controlled substances of Oxycodone and Hydrocodone, and the Schedule IV controlled substances Alprazolam and Clonazepam.

## ENTITIES

2.     The Defendant owned Consolidated Health Services of Memphis, in Memphis, Tennessee ("CONSOLIDATED HEALTH") located at 3315 Hacks Cross Road #109, Memphis, TN 38125.

3. The Defendant also practiced at North Oak Regional Medical Center ("NORMC"), located at 401 Getwell Drive, Senatobia, Mississippi, 38668.

## MEDICAID AND MEDICARE

4. The Medicare Program ("Medicare"), was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Medicare was a "health care benefit program," as defined by Title 18, United States Code Section 24(b).

5. Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the provider. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through Palmetto GBA and other contractors, to review the appropriateness of Medicare payments made to the health care provider.

6. The Tennessee Medicaid Program ("TennCare") was also a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that provided benefits to Tennessee residents who met certain eligibility requirements, including income requirements. Medicaid was a jointly-funded federal-state program.

7. Individuals who were eligible to receive services under Medicare or Medicaid were called "beneficiaries" or "members." Medical service providers, including

2

nurse practitioners, physician assistants, clinics, physicians, and pharmacies ("service providers"), meeting certain criteria, could provide medical services and items to beneficiaries and members, and subsequently submit claims, either electronically or in hardcopy, to Medicare and Medicaid, through fiscal intermediaries, seeking reimbursement for the cost of services and items provided.

8.      The American Medical Association assigned and published numeric codes, known as Current Procedural Terminology (CPT).  The codes were a systematic listing of procedures and services performed by health care providers.  The procedures and services represented by the codes are health care benefits, items, and services within the meaning of Title 18, United States Code, Section 24(b).  They included codes for diagnostic testing and evaluation, consultations, various surgical procedures, and other services, based on complexity, severity, and the average time required to perform each service.  Health care providers and health care benefit programs used CPT codes to describe and evaluate the services for which they claim, and to decide whether to issue or deny payment.   Each health care benefit program established a fee reimbursement for each procedure described by a CPT code.

9.      For typical office visits for established patients these services are billed by service providers to health benefit programs using CPT codes 99211, 99212, 99213, 99214, and 99215.  These codes denote varying levels of services provided, with 99211 being a basic office visit with minimal presenting problems typically lasting about five minutes, and 99215 being an office visit with presenting problems of a moderate to severe nature typically lasting about 40 minutes.  CPT Code 99214 represents the second highest level of care provided to an established patient and these office visits

3

typically last about 25 minutes. Health benefit programs typically reimburse for office visit services on an escalating basis; meaning the higher the level of service rendered, the higher the reimbursement by the health benefit program to the service provider.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

10.     Paragraphs 1 through 9 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

11.     From in or around February 1, 2017, and continuing through in or around August 31, 2018, the exact dates being unknown to the Grand Jury, in Shelby County, the Western District of Tennessee, and elsewhere, the defendant, **JAMES LITTON**, Individual A, a registered nurse practitioner in the State of Tennessee and employed by the Defendant at Consolidated Health, and Individual B, who submitted billing for Consolidated Health, with others known and unknown to the Grand Jury, did willfully and knowingly, combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

        (a)     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment

4

for health care benefits, items, and services, in violation of Title 18, United States
Code, Section 1347.

## Purpose of the Conspiracy

12.     It was a purpose of the conspiracy for defendant **JAMES LITTON** along
with Individuals A and B, and other co-conspirators to unlawfully enrich themselves by,
among other things:  (a) submitting or causing the submission of false and fraudulent
claims to Medicare and Medicaid for services that were (i) medically unnecessary; (ii)
not eligible for Medicare and Medicaid reimbursement; and/or (iii) not provided as
represented; and (b) concealing the receipt and transfer of the proceeds from the fraud;
and diverting proceeds of the fraud for the personal use and benefit of the defendant
and his co-conspirators.

## Manner and Means

The manner and means by which the defendant and his co-conspirators sought
to accomplish the purpose of the conspiracy included, among others, the following:

13.     **JAMES LITTON**, and others on his behalf falsely certified to Medicare and
Medicaid that he, and/or his practices Consolidated Health and NORMC would know
and comply with all Medicare and Medicaid rules and regulations, and federal laws,
including that they would not knowingly present or cause to be presented a false and
fraudulent claim for payment by Medicare.

14.     **JAMES LITTON** and his coconspirators obtained access to hundreds
Medicare and Medicaid beneficiaries by prescribing hundreds of thousands of dosage
units of controlled substances, including medically unnecessary prescriptions for
Oxycodone, Hydrocodone, and Oxymorphone, to Medicare and Medicaid beneficiaries,

5

some of whom were addicted to opioids.  Some of these medically unnecessary opioids were resold on the street.

15.    **JAMES LITTON**, and others would require Medicare and Medicaid beneficiaries, including those addicted to opioids, to pay cash for office visits, telling them that the clinic did not accept the beneficiaries' insurance.  **JAMES LITTON** would ensure the cash was collected and then bill Medicare and Medicaid for the visit.  When patients would complain about paying out of pocket for visits, **JAMES LITTON** observed to Individual A that "[patient] can piss n moan bout not having the money, but if they don't they [sic] seem to find way to pay for cocain and thc n meth.  They can pay or go elsewhere."

16.    **JAMES LITTON** and Individual A sought to "make us lots of money" by inappropriately billing for the second highest reimbursing office visit code on the same date as a psychiatric visit for the same patient.  **JAMES LITTON** instructed Individual A to ensure that she bill "level 4 [office visit] plus 70838 [psychiatric visit] for each visit." Individual A, billing at times under **JAMES LITTON's** Medicare and Medicaid numbers consistently carried out these instructions.  In addition, **JAMES LITTON** would also bill for both an office visit and a psychiatric visit on visits billed when Individual A did not work at Consolidated Health.

17.    **JAMES LITTON** also submitted and caused the submission of false and fraudulent claims to Medicare and Medicaid for office visits at Consolidated Health on days when he was not physically present in the clinic.  In most of these instances, **JAMES LITTON** submitted or caused to be submitted a false or fraudulent claim for the second highest reimbursing office visit code. It takes approximately 48 minutes to drive

one way between Consolidated Health and NORMC.  On several occasions, **JAMES LITTON** billing for office visits when he was not present to see the patient resulted in Medicare being billed for a number of hours that could not realistically be completed in a single day.

18.      At all times during the conspiracy, Individual B at the direction and in coordination with **JAMES LITTON** took actions to ensure the submission of false and fraudulent claims.  This included collecting billing sheets from Individual A and other employees for the purposes of billing false and fraudulent claims to Medicare and Medicaid.  In addition, Individual B would at times retrieve blank, pre-signed prescriptions from **JAMES LITTON** at NORMC and bring them to Consolidated Health for employees to complete as prescriptions for controlled substances, including opioids and benzodiazepines, and provide to patients.

19.      On or around May 2, 2017, **JAMES LITTON,** in order to conceal the existence of the conspiracy, made numerous false statements to an investigator from the Tennessee Department of Health.  These false statements included, but were not limited to:

a.      He was not billing patient insurances for his services, even though he was billing Medicare and Medicaid at that time;

b.      He would typically wean patients off of opioids, and try to reduce his opioid prescriptions, even though his prescribing data shows a steady increase in his average daily Morphine Milligram Equivalents ("MME") steadily increased from April of 2017 through January of 2019.

c.      He only rarely prescribed 90 or more pills of opioids per month to any patient, even though he had approximately 158 patients on 90 or more pills a day of opioids at that time;

d.      He did not as a routine practice prescribe benzodiazepines to his patients, even though he was, at that time, prescribing dozens of patients benzodiazepines, including at least 32 that were receiving benzodiazepines with an opioid and 13 receiving a benzodiazepine with Soma;

20.      As a result of the conspiracy, **JAMES LITTON** and his co-conspirators submitted or caused to be submitted approximately $500,000 in false or fraudulent claims to Medicare and/or Medicaid.

### CONTROLLED SUBSTANCE STATUTES AND CONTROLLING REGULATIONS

21.      The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

22.      Medical practitioners, such as physicians and nurse practitioners, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. Upon application by the practitioner, the DEA assigned a unique registration number to each qualifying medical practitioner including physicians and nurse practitioners.

8

23. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five Schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

24. A controlled substance assigned to Schedule II meant that the drug had a high potential for abuse, was highly addictive, and that the drug had a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Abuse of a Schedule II controlled substance could lead to severe psychological and/or physical dependence. Pursuant to the CSA and its implementing regulations:

a. Hydrocodone was classified as a Schedule II controlled substance after October 2014, before which time it was classified as a Schedule III controlled substance. It was an opioid pain medication.

b. Oxycodone was classified as a Schedule II controlled substance. Oxycodone was sold generically and under a variety of brand names, including OxyContin®, Roxicodone®, Endocet®, and Percacet. Oxycodone, an opioid pain medication, is about fifty percent stronger than Morphine.

c. Hydrocodone and Oxycodone were among the Schedule II opioid controlled substances that had the highest potential for abuse and associated risk of fatal overdose.

25. A controlled substance assigned to Schedule IV meant that the drug or other substance had a lower potential for abuse than Schedule II drugs or other

substances, the drug or other substance had a currently accepted medical use in the United States, and abuse of the drug or other substances may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in the higher Schedules. Pursuant to the CSA and its implementing regulations:

    a. Alprazolam, a benzodiazepine, was classified as a Schedule IV controlled substance. Alprazolam, sometimes prescribed under brand name Xanax, was a medication used to treat anxiety.

    b. Clonazepam, a benzodiazepine, was classified as a Schedule IV controlled substance. Clonazepam, sometimes prescribed under brand name Klonopin, was a medication used to treat anxiety and seizures.

    c.    Carisoprodol was classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14(c). Carisoprodol, sometimes prescribed under brand name Soma, was a muscle relaxant.

26.    Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

27.    Chapter 21 of the Code of Federal Regulations, Section 1306.04, further directed that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

10

28.     It was well known that the combination of high-dose opioids and benzodiazepines (*e.g.*, Alprazolam) in any dose had a significant impact upon the risk of patient intoxication and overdose. For a treating physician to prescribe this combination of high-dose opioids and benzodiazepines for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risk(s) to the patient's life.

29.     On March 16, 2016, the Centers for Disease Control and Prevention ("CDC") issued CDC Guidelines for Prescribing Opioids for Chronic Pain. In that guidance, the CDC warned that medical professionals should avoid prescribing opioids and benzodiazepines (e.g. Alprazolam, Diazepam, and Lorazepam) concurrently whenever possible because of the risk of potentially fatal overdose.

30.     Prescribing and issuing these two medications around the same time quadrupled the patient's risk of overdose and death from the prescribed drugs. Moreover, there was a significant risk of diversion when prescribing or issuing these drugs around the same time. Furthermore, a benzodiazepine served as a "potentiator" for the opioid's euphoric effect by increasing the "high" a user may obtain from opioid and was therefore often sought for this non-legitimate medical purpose.

31.     On August 31, 2016, the U.S. Food and Drug Administration ("FDA") issued a "Black Box" Warning, its strongest warning, to the drug labeling of prescription opioid pain medicines and benzodiazepines. The FDA specifically warned that combined use of opioids and benzodiazepines depresses the central nervous system and results in serious side effects, such as slowed or difficult breathing and death. The FDA further warned health care professionals to limit prescribing opioids with

11

benzodiazepines and cautioned that such medications should only be prescribed together when alternative treatment options are inadequate.

32.    Urine drug screens were relied upon in the pain-management industry as a means of identifying a patient's non-compliance with the patient's treatment plan. Urine drug screens were used to identify abuse of illicit and controlled substances not prescribed to a patient, and to identify a patient's failure to take drugs prescribed for the patient's treatment of pain.

33.    Tennessee's controlled substance monitoring program ("CSMD") was a means of detecting a pain management patient's non-compliance with the patient's treatment plan. A CSMD report contained prescription data for all controlled substances dispensed by pharmacies in the State of Tennessee. Pharmacies were required to report the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

## COUNT 2
### Conspiracy to Distribute and Dispense Controlled Substances
### (21 U.S.C. § 846)

34.    Paragraphs 1 through 3, 14, 19 and 21 through 33 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

35.    From in or around February 2017 through in or around August 2018, in the Western District of Tennessee, and elsewhere, the defendant, **JAMES LITTON,** with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others known and unknown

to the Grand Jury, to violate Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally unlawfully distribute and dispense, mixtures and substances containing a detectable amount of Schedule II controlled substances, including Oxycodone and Hydrocodone, not for a legitimate medical purpose and outside the course of professional practice.

All in violation of Title 21, United States Code, Section 846.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853)

36.     Upon conviction of the offense alleged in Count One, defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7). The United States will also seek a forfeiture money judgment against defendant equal to the value of any such property

37.     Upon conviction of the offense alleged in Count Two, defendant shall forfeit to the United States any property constituting, or derived from, any proceeds defendant obtained, directly or indirectly, as the result of such offense; and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense; pursuant to Title 21, United States Code, Section 853(a). The United States will also seek a forfeiture money judgment against defendant equal to the value of any such property.

38.     In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of

13

the defendants up to the total value of the property subject to forfeiture.

**A TRUE BILL:**

**F O R E P E R S O N**

**DATED:** _____

_____
**D. MICHAEL DUNAVANT**
**UNITED STATES ATTORNEY**

_____
**ALLAN MEDINA**
**CHIEF, FRAUD SECTION, CRIMINAL DIVISION**